AO 91 **INTAKE** Criminal Complaint          AUSAs Devlin N. Su & Erika Csicsila (312) 886-966

**FILED**

≈ **JUL 1 0 2019**

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

JUL 1 0 2019

MAGISTRATE JUDGE
SHEILA M. FINNEGAN

UNITED STATES OF AMERICA

v.

MICHAEL FRONTIER

CASE NUMBER:

**UNDER SEAL**

**19 CR 556**

CRIMINAL COMPLAINT MAGISTRATE JUDGE FINNEGAN

I, the complainant in this case, state that the following is true to the best of my knowledge and belief:

From on or about August 2, 2015, to on or about September 16, 2016, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, defendant MICHAEL FRONTIER devised a scheme to defraud and executed and concealed the scheme by filing a bankruptcy case and documents in a bankruptcy case and making false representations in a bankruptcy case, namely, *In re Michael Frontier*, case number 15-28491, in violation of Title 18, United States Code, Section 157.

This criminal complaint is based upon these facts:

_X_ Continued on the attached sheet.

RUSSELL JEWELL
Special Agent
Federal Bureau of Investigation

Sworn to before me and signed in my presence.

Date: July 10, 2019

Judge's signature

City and state: Chicago, Illinois

SHEILA FINNEGAN, U.S. Magistrate Judge
*Printed name and Title*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

SS

## **AFFIDAVIT**

I, RUSSELL JEWELL, being duly sworn, state as follows:

## I.    **Preliminary Matters**

1.    I am a Special Agent with the Federal Bureau of Investigation (FBI), and have been so employed since approximately June 6, 2010. My current responsibilities include the investigation of white collar crime, including bank, mail, wire, and bankruptcy fraud, as well as organized crime offenses, including but not limited to illegal gambling offenses.

2.    This affidavit is submitted in support of a criminal complaint alleging that MICHAEL FRONTIER devised a scheme to defraud and executed and concealed the scheme by (1) filing a bankruptcy case; (2) filing documents in a bankruptcy case; and (3) making false representations in a bankruptcy case, namely, *In re Michael Frontier*, case number 15-28491, in violation of Title 18, United States Code, Section 157.

3.    Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging FRONTIER with the offense described above, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that defendant committed the offenses alleged in the complaint.

4.     This affidavit is based on my participation in this investigation, my training and experience, information obtained from financial institutions, information obtained from witness interviews, information obtained from public records (including information filed in *In re Michael Frontier*, case number 15-28491), results of physical surveillance, and information received from other law enforcement agents.

## II.     Summary of Probable Cause

5.     There is probable cause to believe that MICHAEL FRONTIER has violated Title 18, United States Code, Section 157 by engaging in a scheme to defraud FRONTIER's creditors and the trustee appointed to administer FRONTIER's bankruptcy case, through which scheme FRONTIER concealed property of his bankruptcy estate from his creditors and the trustee, and executed and concealed the scheme by filing a bankruptcy petition initiating *In re Michael Frontier*, case number 15-28491 (his bankruptcy case); filing documents in his bankruptcy case which contained false representations, and making false representations in and to the United States Bankruptcy Court. Specifically, as set forth in greater detail below, through and as part of this scheme, FRONTIER concealed property of his bankruptcy estate, including cash and cash equivalents in undisclosed income from an illegal gambling business.

III. **Facts Establishing Probable Cause**

A. **Chapter 7 Bankruptcy Overview**

6. To begin a bankruptcy case, a petition must be filed in the United States Bankruptcy Court. Persons who file a petition are referred to as "debtors" under federal bankruptcy law. The filing of a petition creates a "bankruptcy estate" consisting of all legal or equitable interests of the debtor in property, as well as all liabilities of the debtor, as of the commencement of the bankruptcy case.

7. Chapter 7 of the Bankruptcy Code (Title 11 of the United States Code) provides for "liquidation," meaning the sale of a debtor's nonexempt property, and the distribution of the proceeds to creditors.

8. In connection with a Chapter 7 petition, debtors are required to complete and file, under penalty of perjury, (1) schedules of assets and liabilities; (2) a schedule of current income and expenses; (3) a statement of financial affairs; and (4) a schedule of executory contracts and unexpired leases. Individual debtors were also required to file, among other things, a statement of compliance with a credit counseling requirement.

9. The debtor is also required to provide, under penalty of perjury, a list of all creditors and the amount and nature of their claims; the source, amount, and frequency of the debtor's income; a list of all of the debtor's property; and a detailed list of the debtors' monthly living expenses. In particular, debtors were required to disclose personal property, including cash on hand, and other personal property of any kind.

**B.  Filings and Relevant Activity in FRONTIER's Bankruptcy Case**

10.  Publicly available court records indicate that in July 2009, Richard and Tara Mahoney sued FRONTIER in the Circuit Court of DuPage County, Illinois for personal injury, loss of consortium, and negligence, which was captioned *Mahoney v. Frontier*, case number 2009L00836. According to the complaint filed in that case, Mahoney crashed a motorcycle that he and FRONTIER had been fixing, and sustained injury. On or about May 3, 2012, the court entered a judgment against FRONTIER in the total amount of approximately $1,579,618.83.

11.  On or about August 20, 2015, FRONTIER filed a Chapter 7 bankruptcy petition in the United States Bankruptcy Court for the Northern District of Illinois, *In re Michael Frontier*, which was assigned case number 15-28491. Upon the filing of this petition, FRONTIER became a debtor, and all legal or equitable interests that he had in property became property of his bankruptcy estate. FRONTIER signed the petition in a space above the following warning: "Penalty for making a false statement or concealing property. Fine of up to $500,000 or imprisonment for up to 5 years or both."

12.  As part of his petition, FRONTIER filed a Schedule B—Personal Property and Schedule I—Income. FRONTIER made the following statements of relevance in these Schedules:

a.  In Schedule B, FRONTIER stated that he only had $40 of cash on hand, $280 in a TCF checking account, and $650 in miscellaneous household goods

and clothing. Under "Accounts receivable," FRONTIER checked the box indicating "None."

        b.    In Schedule I, FRONTIER stated that he was self-employed, doing "building maintenance for various parties." He stated his monthly gross income was $1,350, with $0 in other net income from "operating a business." The only "other monthly income" he disclosed was $534.10 per month, with the source provided as "[f]ather makes car payment."

13.    As part of his petition, FRONTIER listed total liabilities of $1,635,863.83. His petition included a Schedule F—Creditors Holding Unsecured Nonpriority Claims. Among other creditors, FRONTIER listed the Mahoneys as holding a claim of $1,549,618.83 for "judgment, neglicence [sic] suit for PI & PD."[1]

14.    On or about September 15, 2015, FRONTIER attended a Section 341 meeting[2] in his bankruptcy proceeding. The Section 341 meeting was recorded and under oath. During the meeting, FRONTIER affirmed that he understood that, by signing his bankruptcy petition, he was declaring under penalty of perjury that the information contained in the petition was true and correct. He stated that he did not need to make any changes or corrections to the petition. He similarly answered, "No," to the question, "Can you sue anyone or make a claim against anyone." He was also

---

[1] FRONTIER initially listed the Mahoneys' attorney as also holding a claim in the same amount. He filed an amended Schedule F to fix that error on September 30, 2015; with that amendment, his total liabilities became $1,635,863.83. Other than the judgment he owed to the Mahoneys, his liabilities included a car loan and credit card debt.

[2] Pursuant to 11 U.S.C. § 341, a Section 341 meeting is a meeting involving the United States Trustee, the debtor, and all of the debtor's creditors, during which the Trustee orally examines the debtor under oath regarding the debtor's bankruptcy petition.

asked what he did for work in the past two years. He responded, "I do mainly painting, but some carpentry . . . [it's] word of mouth, pretty much, I know people that are in the trades, it's just by referral."

15. FRONTIER did not file any other supplements or amendments to Schedules B or I. On or about February 16, 2016, the Bankruptcy Court issued an order granting a bankruptcy discharge to FRONTIER, including with respect to the $1,549,618.83 judgment owed to the Mahoneys.

### C.    FRONTIER's Operation of a Gambling Business

16. Contrary to FRONTIER's disclosure and affirmation in his Section 341 meeting that he was self-employed doing building maintenance, as discussed below, FRONTIER was operating an illegal gambling business from at least approximately 2010 through at least approximately December 2016, which generated cash income that FRONTIER concealed from his creditors (including the Mahoneys, who were owed $1,549,618.83 by FRONTIER), and did not disclose his operation of the illegal gambling business during the course of his Chapter 7 bankruptcy proceeding.

### 1.    Background on Internet Based Gambling Businesses

17. An internet-based gambling business, or online sportsbook, utilizes a website where an individual bettor can place wagers and bets upon the outcome of various sporting (or other) events. In order for an individual bettor to gain access to an online sportsbook, he/she must be provided the website URL, a user name, and a password. Once the bettor has access to the online sportsbook, he/she is typically provided credit in order to begin placing bets and wagers. The amount of credit given

to the bettor may vary, but it is not uncommon for a bettor to begin with $100 to $1,000 of credit (as opposed to having to bet cash up front), with the amount of credit increasing over time. While the online sportsbooks may be accessed by bettors within the United States, the servers for the website and the corporations that manage the technical aspects of the website and accounts are located outside of the United States. Many of these websites and servers are housed and located in Costa Rica.

18.    Online sportsbooks are typically organized, managed and supervised by a single bookmaker, who will accept bets from bettors based upon a variety of decisions and expected outcomes of sporting and other events. Underneath them in the hierarchy are "agents," who will either collect or pay out money depending upon the outcome of the sporting event and bet(s) placed by the gambler. In many cases, the agent will enlist the assistance of associates, called "subagents," to assist with increasing the number of bettors utilizing the sportsbook. Subagents are typically responsible for recruiting their own bettors, providing bettors with access to the online sportsbook, and collecting and paying out money from bets. The subagents commonly organize, manage, and supervise their recruited bettors' accounts online. In exchange, the subagents may be compensated with a commission based on a percentage, for example, by receiving a percentage of the gambling losses incurred by their recruited bettors.

19.    The most common practice for collecting and paying out money is for agents and subagents to coordinate with their bettors and conduct hand-to-hand cash

transactions. Money is typically not exchanged through the online sportsbook; only the bets themselves are placed online.

20.     When a bettor places a bet, there is a fee placed upon the bet. Because online sportsbooks are typically credit-based, the fee is the amount being charged to the bettor by the bookmaker to accept the bet. The fee can be either a percentage of the total bet, or a flat fee. That fee is collected by agents and subagents and eventually passed on to the ultimate bookmaker. The agents and/or subagents may keep a share of the fee.

21.     The bookmaker must pay the corporation servicing the technical side of the website and maintaining the computers servers. This is typically a "per-head" fee based upon the number of gambling accounts the bookmaker has provided to the total number of bettors who bet with him/her. Based on my training and experience conducting organized crime and illegal gambling investigations, I believe that most of the Costa Rican companies servicing online sportsbooks charge approximately $5.00 to $10.00 "per head," or per gambling account. Depending on the number of accounts and size of the overall online sportsbook, the bookmaker may be charged a flat fee, or a combination of a flat fee and "per-head" cost. This fee is typically passed by the bookmaker on to their agents, who must pay on a weekly-to-monthly basis and is typically sent utilizing an international money transfer service.

### 2.     Statements of Former Participants

22.     Law enforcement has interviewed multiple former participants in FRONTIER's internet gambling business. According to these individuals,

FRONTIER served as the agent for online sportsbooks, including one located at 1betvegas.com.[3] They all first began betting with FRONTIER, then eventually began assisting FRONTIER by recruiting additional bettors for FRONTIER and collecting and delivering gambling proceeds (in other words, acting as his subagents). One associate helped FRONTIER by wiring money to Costa Rica (believed to be the fee owed by FRONTIER to his online sportsbook). These individuals all participated in FRONTIER's gambling business beginning in the years immediately preceding FRONTIER's bankruptcy proceedings, and through approximately 2016, after FRONTIER filed his Chapter 7 petition and the year that FRONTIER's debts were discharged. The following is a summary of information separately provided by those individuals:

*Sub-Agent 1*

23.    Sub-Agent 1 ("SA-1") provided the following information to law enforcement.[4] SA-1 began gambling on sporting events through FRONTIER beginning in approximately 2011 or 2012, and bet on sporting events through FRONTIER for approximately 3-4 years. Frontier gave SA-1 a username and a password for a website where SA-1 could place SA-1's bets. Those websites changed

---

[3] At the times referenced in this complaint, sports bookmaking constituted a criminal offense under both federal law (18 U.S.C. § 1955) and the law of the State of Illinois (720 ILCS 5/28-1.1).

[4] SA-1 has two prior controlled substance felony convictions. SA-1 was given proffer protection for this information and was informed that SA-1 was not a focus of the investigation. No other promises or assurances were made about what benefits SA-1 might receive for SA-1's cooperation.

periodically, but SA-1 recalled that 1betvegas.com was one of the sites. According to SA-1, FRONTIER was the "agent" for the site.

24.     SA-1 stated that SA-1 usually bet on baseball games, usually at the rate of $100 per game and $100 on a parlay, meaning a bet on two games that would both need to win in order for SA-1 to win money. SA-1 recalled betting on baseball through the 2016 season, which SA-1 remembered because that was the year that the Chicago Cubs won the World Series.

25.     When SA-1 started gambling, FRONTIER started SA-1 at a weekly limit of $1,500 per week, meaning that was the most SA-1 could bet each week. That weekly limit was then reflected on the website, so SA-1 could not bet more than that. Over time, the weekly limit increased to $2,000 and then eventually to $4,000 per week at SA-1's request. Throughout SA-1's time gambling with Frontier, however, SA-1's consistent per-game limit was $500, meaning that was the most SA-1 could win on each game. SA-1 estimated that in total, SA-1 lost between approximately $30,000 and $40,000 while betting with Frontier.

26.     SA-1 stated that about once a week, SA-1 met FRONTIER to either pay him if SA-1 lost or collect if SA-1 won. FRONTIER would come by SA-1's house a lot to meet, and a few times they met in a gas station. They dealt in cash only.

27.     Towards the end of the time that SA-1 placed bets with FRONTIER, SA-1 met acquaintances, Bettor 1 and Bettor 2, who knew that SA-1 was gambling online and asked if they could place bets using SA-1's account. SA-1 then asked FRONTIER if SA-1 could open up another account so SA-1 could place bets for them so that their

bets would not run up against SA-1's personal betting limits. FRONTIER then opened up another two accounts on a website whose name SA-1 didn't recall. SA-1 passed those usernames and passwords along to Bettor 1 and Bettor 2 so they could gamble directly. They usually bet between $100 and $300 mostly on football games. Bettor 1 had a $1,500 weekly limit, and Bettor 2 had a $500 weekly limit. On one of the websites, SA-1 could track how Bettor 1 and Bettor 2 were doing on an "agent screen" by logging in with SA-1's regular password, while another website required a special administrator login in order to track their gambling. Because FRONTIER didn't know who SA-1's gamblers were, FRONTIER asked SA-1 to take care of it, so SA-1 would collect the money approximately weekly from SA-1's associates and then give it to FRONTIER. If SA-1's friends won, FRONTIER would give SA-1 their winnings and SA-1 would pay them when SA-1 saw them. Because SA-1 was dealing with these gamblers directly on behalf of FRONTIER, FRONTIER gave SA-1 10% of the total losses that both gamblers incurred on each game. For example, if both Bettor 1 and Bettor 2 both lost $100 gambling on a football game, FRONTIER gave SA-1 $20, which he credited against SA-1's personal gambling debt. However, if one won $100 and the other lost $100, SA-1 got nothing from FRONTIER.

28. SA-1 stopped gambling with FRONTIER some time in 2016, after the websites stopped accepting bets. Around that time, FRONTIER told SA-1 that the websites ran into some trouble, but FRONTIER didn't go into any detail about what kind of trouble. Accordingly, SA-1 continued betting and working for FRONTIER during the pendency of FRONTIER's Chapter 7 proceeding.

*Sub-Agent 2*

29.     Sub-agent 2 ("SA-2") provided the following information to law enforcement.[5] SA-2 began placing sports bets through FRONTIER's website, 1betvegas.com, in approximately 2011 or 2012. FRONTIER provided SA-2 with a username and password for the website. If SA-2 had questions about technical issues with the website, FRONTIER told SA-2 to call the helpline listed on the website. When SA-2 did that, the person on the other end of the line would ask SA-2 who SA-2's agent was, and SA-2 would say, "Mike Frontier." If SA-2 wanted to cancel a bet, or if there were issues related to money, or if SA-2 wanted to increase or decrease SA-2's credit limit, FRONTIER wouldn't tell SA-2 to call the website, but instead would say that he had to talk to "his guy" first. SA-2 never knew the identity of FRONTIER's "guy."

30.     When betting on the website, SA-2 had a credit limit, although that limit varied over the course of time, from approximately $1,000 to approximately $5,000. SA-2 paid 10% "juice," meaning that if SA-2 wanted to place a $100 bet, SA-2 wagered $110 to make $100.

31.     Over the years, SA-2 lost more than SA-2 won, totaling approximately $20,000 in cash losses over the entire time period. FRONTIER didn't make SA-2 pay every time SA-2 owed money. Rather, FRONTIER would only make SA-2 pay him

---

[5] SA-2 has a prior conviction that is more than ten years old for driving under the influence. SA-2 was given proffer protection for this information and was informed that SA-2 was not a focus of the investigation. No other promises or assurances were made about what benefits SA-2 might receive for SA-2's cooperation.

when SA-2 reached a certain threshold level of SA-2's credit limit (for example, FRONTIER would make SA-2 pay when SA-2 was at a $600 deficit of SA-2's full $1,000 credit limit). If SA-2 did have to pay, FRONTIER would either come by SA-2's house or office to collect, or SA-2 would meet FRONTIER somewhere to deliver cash to FRONTIER.

32.    Over time, SA-2 introduced other bettors to FRONTIER's gambling business. For example, two of SA-2's roommates placed bets through FRONTIER's website using SA-2's account. SA-2 also introduced other bettors to FRONTIER's gambling business, including Bettor 3 and Bettor 4. In exchange, FRONTIER arranged to provide SA-2 10% on the collections that SA-2 made from these bettors on behalf of FRONTIER. When SA-2 received a 10% commission payment, FRONTIER sometimes paid SA-2 in cash, and he sometimes took the percentage off what SA-2 owed FRONTIER from SA-2's own gambling debts.

33.    SA-2 was aware of other people who bet through FRONTIER, including SA-2's friend, SA-1. SA-2 believed from conversations that SA-2 had with SA-1 that SA-1 would sometimes collect money from other bettors on FRONTIER's behalf, and that FRONTIER had a similar commission arrangement with SA-1 as with SA-2.

34.    SA-2 stopped betting with and working with FRONTIER approximately a year after FRONTIER's brother died.  FRONTIER's brother died in September 2015; therefore, SA-2 was betting and working with FRONTIER during the pendency of FRONTIER's Chapter 7 proceeding.

*Sub-Agent 3*

35.     Sub-Agent 3 ("SA-3") provided the following information to law enforcement.[6] SA-3 first met FRONTIER in approximately 2014. Approximately a year or so later, SA-3 began placing sports bets with FRONTIER. FRONTIER gave SA-3 the address to a sports betting website, 1betvegas.com, and also provided SA-3 with a login and password.

36.     After SA-3 received that information from FRONTIER, SA-3 began placing sports bets online. SA-3 didn't make much money at the time, and SA-3 was placing smaller bets a couple of times a week, mostly on football—somewhere in the range of approximately $5 up to $30. SA-3 increased the amount of SA-3's bets over time, but not significantly, to approximately $50-$100 a game.

37.     While gambling with FRONTIER, SA-3 also obtained 1betvegas.com website accounts for three other bettors. SA-3 oversaw two of those bettors' accounts through 1betvegas.com, meaning that SA-3 could go onto the website and see if they won or lost. After, SA-3 "settled up" their accounts with them, meaning that SA-3 would collect their cash if they lost, and then pay that money directly to FRONTIER, or FRONTIER would give SA-3 their winnings to deliver to them. When SA-3 met FRONTIER to give SA-3 the money, they would often get together for lunch, or SA-3 would give it to FRONTIER on the weekend when SA-3 saw FRONTIER socially.

---

[6] SA-3 was given proffer protection for this information and was informed that SA-3 was not a focus of the investigation. No other promises or assurances were made about what benefits SA-3 might receive for SA-3's cooperation.

38.     SA-3 last bet with FRONTIER approximately two years ago, when SA-3 bet on the 2017 Super Bowl. SA-3 believed that the other bettors stopped betting with FRONTIER around that time as well, as SA-3 was no longer collecting from them or paying out to them at that point. Accordingly, SA-3 continued betting and working for FRONTIER during the pendency of FRONTIER's Chapter 7 proceeding.

*Sub-Agent 4*

39.     Sub-Agent 4 ("SA-4") provided the following information to law enforcement.[7] According to SA-4, SA-4 met FRONTIER in approximately 2010 or 2011. Over the course of a few years, SA-4 placed online sports bets with FRONTIER, who eventually gave SA-4 a username and password for the website 1betvegas.com. SA-4 typically bet approximately $50-200 per game on football games, and SA-4 bet on a couple of games a week on average. The website limited the amount SA-4 could bet on any game; SA-4's account had a limit of approximately $300 per game, and a weekly limit of $1,000. SA-4 regularly lost on SA-4's bets, and overall lost more than SA-4 won. If SA-4 lost, SA-4 typically had to pay the amount SA-4 bet plus 10%. SA-4 did not keep exact track of SA-4's total losses with FRONTIER, but SA-4 estimated SA-4 lost, on average, approximately $5,000 a year.

40.     SA-4 recruited approximately five bettors for FRONTIER, including SA-3. SA-4 asked FRONTIER for usernames and passwords for them, which SA-4 received from FRONTIER and then provided them to the bettors. SA-4 believed these

---

[7] SA-4 was given proffer protection for this information and was informed that SA-4 was not a focus of the investigation. No other promises or assurances were made about what benefits SA-4 might receive for SA-4's cooperation.

bettors bet similar amounts as SA-4, in part because SA-4 would often get the money from them to give to FRONTIER, or FRONTIER would give SA-4 their winnings to pass along back to them. On a handful of occasions, SA-4 would accept money from someone SA-4 didn't know at FRONTIER's request, and then FRONTIER would later collect the money from SA-4. On some of those occasions, in exchange, FRONTIER gave SA-4 a discount on what SA-4 owed FRONTIER, or possibly gave SA-4 cash. There were also other times that SA-4 gave another gambler SA-4 knew, SA-3, the money SA-4 and others owed to FRONTIER, and then SA-3 provided the cash to FRONTIER.

41.     SA-4 stopped gambling with FRONTIER in approximately 2016 or early 2017. SA-4 recalled trying to log onto the website and was unable to do so. Accordingly, SA-4 continued to bet with and work as a sub-agent for FRONTIER during the pendency of FRONTIER's Chapter 7 proceeding.

### *Individual A*

42.     Individual A provided the following information to law enforcement.[8] Individual A first met FRONTIER in approximately 2013 or 2014. At some point after FRONTIER's brother died in September 2015, FRONTIER asked if Individual A wanted to make some extra money by running some errands for him. Individual A agreed.

---

[8] Individual A has no known criminal history. Individual A was given proffer protection for this information and was provided with a non-target letter. No other promises or assurances were made about what benefits Individual A might receive for Individual A's cooperation.

43.     FRONTIER then asked Individual A to pick up money orders, go to currency exchanges to pay bills, and wire money down to Costa Rica. They sometimes met at lunchtime, and FRONTIER would give Individual A cash for the errands over lunch. Other times, FRONTIER would just give Individual A cash in a parking lot. For each errand Individual A ran, FRONTIER gave Individual A approximately $100 each time.

44.     Individual A typically wired money to Costa Rica one to two times a week, though sometimes more. Individual A sent money to Costa Rica through MoneyGrams located in Walmarts, including the Walmart on North Avenue and Wolf Road in Northlake, Illinois, and the Walmart in Addison, Illinois near Route 53 and Lake Street. Individual A was sometimes asked by FRONTIER to wire money in short order because it was time-sensitive. Individual A recalled wiring the money to multiple people in Costa Rica, and was able to recall the name of three individuals money was sent to. FRONTIER would tell Individual A which people to send the money to on any given occasion, or sometimes FRONTIER had the request form already filled out and Individual A would just take it to Walmart to do the wiring. At FRONTIER's direction, Individual A used fake names to wire the money to Costa Rica, including "Matthew Sullivan" and "Ira Goldberg." FRONTIER told Individual A which names to use for any given transaction; Individual A did not come up with the sender names. Each time, Individual A wired approximately $500 to Costa Rica; including fees, the total came to $508 per transaction. Individual A sent money to Costa Rica for approximately a year and a half.

45.     Individual A never asked FRONTIER specifically what purpose was served by wiring the money to Costa Rica, and Individual A did not recall having an explicit conversation with FRONTIER about the purpose of these wirings. But after a while, Individual A started to figure out that Individual A was helping FRONTIER with FRONTIER's sports betting business, which Individual A knew FRONTIER to be involved in because of things Individual A had heard about FRONTIER. Additionally, from FRONTIER's use of fake names, and Individual A's use of Individual A to do the wirings, Individual A understood that FRONTIER wanted to distance himself from the wirings.

### 3.     MoneyGram Records

46.     Records obtained from MoneyGram corroborate Individual A's statements regarding the money Individual A sent to Costa Rica. Specifically, from approximately February 2015 to December 2016—during the pendency of FRONTIER's Chapter 7 bankruptcy—MoneyGram records indicate that approximately 35 wirings totaling approximately $16,800 were made to individuals in Costa Rica either by aliases "Matthew Sullivan" or "Ira Goldberg" or (based on surveillance footage of FRONTIER's wiring the money personally) by FRONTIER himself. These wirings were transmitted from MoneyGrams located in the Walmarts in Northlake, Illinois and Addison, Illinois, and were in the amount of either $300, $450, or $500. On several occasions, surveillance video obtained from these MoneyGram locations depict individuals positively identified by law enforcement as FRONTIER or Individual A making these transactions.

47.  Based on my training and experience conducting organized crime and illegal gambling investigations, I believe that these wirings, made during the pendency of FRONTIER's bankruptcy proceedings, represented fees being paid to the company which managed and coordinated FRONTIER's online sportsbook, including the website 1betvegas.com.

48.  In sum, I believe there is probable cause that, beginning in approximately 2010, and lasting until 2016—including while his Chapter 7 bankruptcy was pending—FRONTIER was operating an illegal gambling business. The cash income that he earned from this business was never disclosed on any schedules filed with his Chapter 7 bankruptcy petition, in his Section 341 meeting, or in any supplemental schedules filed while his bankruptcy was pending. Accordingly, I further believe there is probable cause that FRONTIER fraudulently concealed income and assets comprising property of his bankruptcy estate from his creditors and the trustee, and made false statements in connection with that proceeding.

## IV.   CONCLUSION

49.    Based on the information above, I respectfully submit there is probable cause to believe that defendant MICHAEL FRONTIER devised a scheme to defraud and executed and concealed the scheme by filing a bankruptcy case and documents in a bankruptcy case and making false representations in a bankruptcy case, namely, *In re Michael Frontier*, case number 15-28491, in violation of Title 18, United States Code, Section 157.

FURTHER AFFIANT SAYETH NOT.

RUSSELL JEWELL
Special Agent
Federal Bureau of Investigation

SUBSCRIBED AND SWORN to before me on July 10, 2019.

SHEILA FINNEGAN
United States Magistrate Judge