# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

UNITED STATES OF AMERICA

v.

MICHAEL FRONTIER

Case No. 19-CR-556-1

Judge John Robert Blakey

## MEMORANDUM OPINION AND ORDER

On October 10, 2019, the Special July 2018 Grand Jury returned a fourteen-count indictment charging Michael Frontier with: (1) knowingly conducting, managing, supervising, and directing an illegal gambling business, and transmitting proceeds from that business via MoneyGram from locations in and around Chicago to Costa Rica, in violation of 18 U.S.C. § 1955(a) (count one); (2) knowingly transmitting and transferring funds from places in the United States to places outside the United States, with the intent to promote the operation of that illegal gambling business, in violation of 18 U.S.C. § 1956(a)(2)(A) (counts two through six); (3) devising and participating in a scheme to defraud by filing a fraudulent bankruptcy petition and other false and fraudulent documents, in violation of 18 U.S.C. § 157(1), (2), and (3) (counts seven through thirteen); and (4) making a materially false declaration under oath in connection with the bankruptcy proceedings, in violation of 18 U.S.C. § 1623(a). *See* [18], [19].

During its investigation, the government obtained authorization for intercepts of wire communications under 18 U.S.C. § 2518 ("Title III") for a cellular telephone

1

used by Mr. Frontier, Target Telephone 10. He now challenges the supporting affidavit used for Target Telephone 10's Title III intercept and requests an evidentiary hearing under *Franks v. Delaware,* 438 U.S. 154 (1978). [72]. For the reasons discussed below, the Court denies the motion.

## I.    Factual Background

This case arises out of the FBI's years-long investigation of the Chicago organized crime family, better known as the Chicago Outfit and, more specifically, the Outfit's "street crew" known as the Elmwood Park Street Crew. [74-1] at 33.

On June 30. 2016, the government applied under Title III to then-Chief Judge Rubén Castillo for authorization to intercept the wire communications stemming from two cellular telephones (one used by Defendant, Michael Frontier), "because there is probable cause to believe that certain of the Interceptees and others as yet unknown are committing and will continue to commit violations specified in Title 18 United States Code Section 2516, namely: obstructing and affecting commerce by extortion and conspiring and attempting to do so, in violation of 18 U.S.C. § 1951; conducting an illegal gambling business, in violation of 18 U.S.C. § 1955; using facilities of interstate commerce to carry on and promote unlawful activity namely prostitution, in violation of 18 U.S.C. § 1952; laundering of monetary instruments and conspiracy to do so, in violation of 18 U.S.C. § 1956; transportation of an individual in interstate commerce with intent that such individual would engage in prostitution, in violation of 18 U.S.C. § 2421; inducing an individual to travel in interstate commerce to engage in prostitution, in violation of 18 U.S.C. § 2422;

structuring financial transactions to avoid reporting requirements, in violation of 31 U.S.C. § 5324; conducting the affairs of an enterprise affecting interstate commerce through a pattern of racketeering consisting of the above-described offenses and conspiracy to do so, in violation of 18 U.S.C. §§ 1962(c) and (d), and 1963; and conspiracies to commit offenses against the United States, in violation of 18 U.S.C. § 371 (hereinafter the 'Subject Offenses')." [74-1] at 3–4.

This was not the first such application. In fact, the government has been surveilling the Chicago Outfit for decades, and it filed successful wiretap applications in the months preceding the instant application, including on April 1, 2016, *see* [74-2], and on May 16, 2016, *see* [74-3], in connection with an investigation of the Elmwood Park Street Crew's activities. The April and May applications, which focused upon mob activities directed at prostitution, rather than specifically on illegal gambling, mentioned Michael Frontier (among numerous others), [74-2] at 6–7; [74-3] at 10, 14, but they did not seek to intercept wireless communications originating from any cellular phone directly tied to him.[1]

Special Agent Lynda Thomas submitted an affidavit in support of the April 1, 2016 application, which indicated that there was probable cause to believe that

---

[1] The April 1, 2016 application requested the initial interception of wireless communications over Target Phones 1 and 3, cellular phones used by Jessica Nesbitt, who was alleged to operate and control the prostitution business referenced above; the May 16, 2016 application requested the continued interception of wire communications over Nesbitt's Target Phones 1 and 3, as well as the initial interception of wire communications over Target Phone 5, a cellular phone used by Gary Gagliano, who was alleged to be associated with the Chicago Outfit's Elmwood Park Street Crew and to have extorted "street tax" or "protection money" from Nesbitt as a cost of operating her illegal prostitution business in Outfit territory; and the June 30, 2016 application requested the continuing interception of wire communications over Gagliano's Target Phone 5, as well as the initial interception of wire communications over Target Phone 10, a cellular phone used by the Defendant Michael Frontier.

numerous individuals (including Gary Gagliano and Michael Frontier) had committed, are committing and will continue to commit the "Subject Offenses," defined as: obstructing and affecting commerce by extortion, and conspiring and attempting to do so, in violation of 18 U.S.C. § 1951; using facilities of interstate commerce to carry on and promote unlawful activity, namely, prostitution, in violation of 18 U.S.C. § 1952; laundering of monetary instruments and conspiracy to do so, in violation of 18 U.S.C. § 1956; transportation of an individual in interstate commerce with intent that such individual would engage in prostitution, in violation of 18 U.S.C. § 2421; inducing an individual to travel in interstate commerce to engage in prostitution, in violation of 18 U.S.C. § 2422; conducting the affairs of an enterprise affecting interstate commerce through a pattern of racketeering consisting of the above described offenses and conspiring to do so, in violation of 18 U.S.C. §§ 1962(c) and (d) and 1963; and conspiracies to commit offenses against the United States, in violation of 18 U.S.C. § 371. [74-2] at 24, ¶ 2.

Agent Thomas represented in her April 1, 2016 affidavit that Gagliano was associated with the Chicago Outfit's Elmwood Park Street Crew, and that the Chicago Outfit's street crews engaged in (among other activities) the collection of street taxes or extortion payments, the operation of illegal gambling businesses, including sports bookmaking and the use of video gambling devices, the making of juice loans, and the collection on such loans and on gambling debts using threats, violence, and intimidation. *Id.* at 92–93, 94. Agent Thomas also represented that Defendant Frontier and others believed to be associated with the Elmwood Park

4

Street Crew were the subject of an investigation concerning illegal gambling activities conducted by the Outfit.  *Id.* at 123, 130.

Special Agent Erik Anderson prepared affidavits in support of the May 16, 2016 and June 30, 2016 applications.  Agent Anderson's May affidavit included the same or similar allegations as those referenced in Agent Thomas' April affidavit, and did so based upon his training, experience, and personal involvement in the investigation of the subject offenses, as well as knowledge based upon information provided by confidential informants and cooperating witnesses, other law enforcement officers, and knowledge stemming from prior surveillance and investigations.  *See* [74-3] at 2, 5–7, 10, 37–39.

In his June 2016 affidavit, [74-1] at 24–102, Agent Anderson represented that Frontier used Target Phone 10 to communicate with Gagliano and other organized crime associates to "discuss and facilitate the business" of the Outfit's Elmwood Park Street Crew, "including the collection, transfer, and distribution of illegally obtained proceeds [including] proceeds generated from illegal gambling and extortion."  [74-1] at ¶ 11.  Agent Anderson's affidavit laid out Frontier's association with the Chicago Outfit's Elmwood Park Street Crew and claimed that Frontier was "involved in illegal activity traditionally associated with organized crime," including threatening people with bodily injury if they failed to repay gambling debts.  *Id.* ¶ 12.  Agent Anderson claimed that a cooperating individual, CI-9, reported that Frontier had beaten one individual over a gambling debt and threatened another.  *Id.*

Chief Judge Castillo granted the June application on June 30, 2016 and authorized the interception of wire communications from Defendant's cellular telephone for a period not to exceed thirty days, *see* [74-1] at 9, 17. Law enforcement arrested Defendant Frontier in September 2019, and the grand jury indicted him on October 10, 2019. *See* [5], [14], [18], [19].

On May 17, 2022, Frontier moved to suppress "the fruits and derivative evidence of the Title III interceptions of his cellular telephones and other private communications, pursuant to the Fourth Amendment to the U.S. Constitution, 18 U.S.C. §§ 2515 and 2518(10)(a), Fed. R. Crim. P. 12(b)(3)(C), and *Franks v. Delaware*, 438 U.S. 154 (1978)." [72] at 1. In seeking to suppress, Frontier argues that the affidavits submitted in support of the wiretap applications contained materially false allegations and information supplied in reckless disregard for the truth; he also argues that the affidavits excluded material information that would have impacted the probable cause analysis. [74] at 1. Frontier requests a hearing, in accordance with *Franks*. *Id.*

## II.   **Legal Standard**

The law presumes the validity of affidavits supporting search warrants. *United States v. Johnson,* 580 F.3d 666, 670 (7th Cir. 2009). But a search warrant may be found invalid if the affiant obtains it by intentionally or recklessly presenting false, material information to the presiding judge. *Id*. A defendant challenging the validity of a warrant under *Franks* may obtain an evidentiary hearing, provided he can make a substantial preliminary showing that: (1) the warrant affidavit contained

6

a false statement; (2) the affiant made the false statement intentionally or with reckless disregard for the truth; and (3) the false statement was material to the finding of probable cause. *Franks*, 438 U.S. at 155–156. This standard also applies to material omissions, provided a defendant shows that the affiant intentionally or recklessly omitted such information. *United States v. Mullins*, 803 F.3d 858, 862 (7th Cir. 2015); *United States v. Kimberlin*, 805 F.2d 210, 252 (7th Cir. 1986) (omission of a fact from an affidavit is material only if it undermines probable cause and amounts to a "deliberate falsehood or reckless disregard for the truth").

To warrant a hearing, however, a defendant's showing must contain more than conclusory allegations of deliberate or reckless misstatements, allegations of negligence, or the identification of mere factual errors. *United States v. McMurtrey*, 704 F.3d 502, 509 (7th Cir. 2013). Instead, a defendant must identify evidence showing that specific portions of the warrant affidavit constituted intentional or reckless misrepresentations, and that the affiant knowingly misled the court or entertained "serious doubts as to the truth of his allegations." *United States v. Lowe*, 516 F.3d 580, 584 (7th Cir. 2008) (quoting *United States v. 218 Third Street*, 805 F.2d 256, 258 (7th Cir. 1986)); *United States v. Jones*, 208 F.3d 603, 607 (7th Cir. 2000) (to justify a hearing, then, the defendant must make an offer of proof with a specific statement of supporting reasons that both identifies the allegedly false portion of the affidavit and focuses upon the affiant's state of mind); *United States v. Pritchard*, 745 F.2d 1112, 1116 (7th Cir. 1984).

Finally, a defendant's substantial showing must focus upon the law enforcement officer's state of mind when the officer executed the affidavit in support of the search warrant request. *United States v. Owens*, No. 16-CR-38-JPS, 2016 WL 7079609, at *5 (E.D. Wis. December 5, 2016); *Jones*, 208 F. 3d at 607. Ultimately, this Court's determination turns not upon whether the affidavit contained false information, but rather whether the affiant knew the information was false (or recklessly disregarded the misrepresentation) at the relevant time. *United States v. Schultz*, 586 F.3d 526, 531 (7th Cir. 2009).

Because it is difficult to meet this standard, the law rarely requires a *Franks* hearing. *United States v. Maro,* 272 F.3d 817, 821 (7th Cir. 2001); *Franks*, 438 U.S. at 171 (a defendant seeking a *Franks* hearing bears a substantial burden); *see also United States v. Hornick*, 815 F.2d 1156, 1158 (7th Cir. 1987) ("[defendant] bears a substantial burden to demonstrate probable falsity"); *United States v. Souffront*, 338 F.3d 809, 822–23 (7th Cir. 2003).

## III.    Discussion

### A.    Intentional or Reckless Disregard for the Truth

At the pre-*Franks* hearing on February 1, 2023, the Court drilled down on what specific statements Defendant claims were false or misleading. At that time, defense counsel identified three alleged statements or categories of statements: (1) the statements in the April and May affidavits that probable cause existed to believe that Frontier had anything to do with prostitution-related offenses; (2) statements attributed to CI-9 about Frontier's use of threats, intimidation, and violence; and (3)

Agent Anderson's representation that a trash pull, a less intrusive investigative technique than a wiretap, would not be sufficient to achieve the needs of the investigation.[2]

### 1.   Probable Cause Regarding the Subject Offenses

First, as to the April 1, 2016 application, Frontier's counsel claims the probable cause statement is false. The affidavit claims there is probable cause to believe that Frontier, and numerous others, have committed, are committing, and will continue to commit the "Subject Offenses," defined in that application to include, *inter alia*, obstruction and affecting commerce by extortion, and conspiring and attempting to do so, in violation of 18 U.S.C. § 1951; using facilities of interstate commerce to carry on and promote unlawful activity, namely, prostitution, in violation of 18 U.S.C. § 1952; laundering of monetary instructions and conspiracy to do so, in violation of 18 U.S.C. § 1956; conducting the affairs of an enterprise affecting interstate commerce through a pattern of racketeering consisting of the above described offenses and conspiring to do so in violation of 18 U.S.C. §§ 1962(c) and (d), and 1963; and conspiracies to commit offenses against the United States, in violation of 18 U.S.C. § 371. [74-2] at 4–5.

Counsel argues that the agent lacked any basis to claim that his client was involved in any prostitution business, making the probable cause statement false. Why does counsel argue that? He claims he knows his client had no involvement in

---

[2] Defense counsel waived his claim as to any issues not specifically developed at the pre-*Franks* hearing. *United States v. Butler*, 58 F.4th 364 (7th Cir. 2023) (holding that a party waives undeveloped arguments).

any extortion of Nesbitt's prostitution business, as evidenced by the fact that nobody was charged with such conduct. At the pre-*Franks* hearing, counsel argued that there was no extortion between Gagliano and Nesbitt, and instead, the two had a lawful relationship—whether landlord/tenant, some type of romantic or sexual connection, or something else. But, as explained above, counsel's personal characterizations of the facts will not suffice; rather, the defense must identify evidence to make a proper showing of falsity. Here, Defendant has failed to do so.

Moreover, even if the Court were to accept counsel's unsupported representation that Frontier had nothing to do with the prostitution business or the crew's alleged extortion of the prostitution business, this representation does not make the probable cause statement false because the assertion of probable cause refers to the broader operation of the enterprise. Thus, the agent's belief that Frontier was involved in *some* of the enterprise's activities (a belief Fronter has not even challenged), makes the statement true, even if Fronter was not himself personally involved in the operation of the prostitution business or the specific extortion of Nesbitt. Here, Frontier fails to challenge the existence of probable cause as to the enterprise's other illegal activities, and the fact that defense counsel believes that Frontier did not commit *all* of the subject offenses does not make the affiant's probable cause representation false. Likewise, the fact that Frontier ultimately was not charged with a specific offense says nothing about whether law enforcement had probable cause as to his involvement in the affairs of the racketeering enterprise.[3]

---

[3] More fundamentally, on the issue of materiality (discussed further herein), the wiretap of Defendant's phone was not based upon the April and May statements about probable cause; rather,

### 2. __Issues with Confidential Informants__

Counsel next raises issues stemming from the agents' citation to information by certain cooperating individuals. First, counsel argues that Agent Anderson's June affidavit fails to disclose background information for CI-1 and CI-9. Counsel also attacks the veracity of information obtained from CI-9 to support Frontier's claimed use of threats, intimidation, and violence.

Although it is true that the affidavits do not specifically identify the CIs by name (they are not required to do so), the record undermines Defendant's claim that the affidavits contain no background information on the cooperators. For example, with respect to CI-9, Agent Anderson states in his June affidavit that "CI-9 has provided information to the FBI since approximately January 2011, and CI-9's information has been corroborated by independent investigation and found to be reliable. CI-9 has many arrests, including arrests for drug possession and driving with a suspended license. CI-9 has been compensated for expenses incurred relating to investigative activity." [74-1] at 36 n.6.

Additionally, Agent Anderson's May affidavit states that CI-1 had been interviewed on three occasions in connection with the prostitution-related investigation and found to be credible, based upon other corroborating information gathered during the course of the investigation; he also indicates that CI-1 had a prior theft conviction, was believed to be engaged in prostitution when he/she provided

---

his communications were intercepted based upon the later application, which focused more specifically on the crew's non-prostitution-related activities, including illegal gambling operations.

information to the FBI and continued to be engaged in prostitution after he/she stopped serving as an FBI source, worked for Nesbitt's business until 2014, and reported that Gagliano served as Nesbitt's "Chicago Outfit connection." [74-3] at ¶¶ 37–38 and 47 n.18. Furthermore, the affidavit also recounts information CI-1 provided concerning Nesbitt and Gagliano and indicates that a search of "Target Email Accounts" and selected interceptions of Nesbitt's phones (obtained via the prior wiretap) corroborated such information. *Id.* ¶¶ 41–47. Agent Anderson's June affidavit also confirms that CI-1 previously provided information concerning Nesbitt and her relationship with Gagliano but indicates that, by June, he/she had ceased cooperating and refused to respond to the government's efforts to contact him/her. [74-1] at 71. Based upon all the entire record, the judge possessed sufficient information to materially assess the credibility of these cooperators (and, of course, remained free to ask for further clarification if necessary).[4]

---

[4] Agent Anderson's June affidavit provides information for other CIs as well, indicating that: **CI-10**, who provided information to tie Gene Cassano to the Outfit, has provided reliable, corroborated information to the FBI since approximately 1994, was arrested for possession of a controlled substance in 1988 and "received approximately $28,767 from the FBI" for his/her assistance, [74-1] at 37 & n.10; **CI-7**, who provided independently corroborated, reliable information linking John Matassa to the Outfit, has been cooperating with the government since approximately August of 2011, was previously charged with multiple extortion offenses and pled guilty to extortion, admitted to using illegal drugs (including marijuana and cocaine) throughout the course of his cooperation, and received approximately $7,543.17, as well as a reduced sentence, based upon his cooperation, *id.* at 38 & n.11; **CI-6**, who has reliably claimed to be personally acquainted with numerous top members of the Chicago Outfit and to have participated in major criminal activities, has been providing reliable, trustworthy information to the FBI concerning the Chicago Outfit for more than 30 years, which has led to the identification and conviction of Chicago Outfit members; he/she has felony convictions and has been paid approximately $100,261 for information he/she provided, *id.* at 38–39 & n.12; **CI-8**, who tied Anthony Dote to the Outfit's Elmwood Park crew's bookmaking activities and tied Marco Damico and his nephew Angelo Damico to Outfit-associated bookmaking operations, provided corroborated, reliable information to the FBI from approximately 2009 until approximately November of 2014, when the FBI closed him/her as a source; he/she has convictions for larceny, and burglary, *id.* at nn.21, 26. Agent Anderson's May affidavit also provides similar background information for **CI-3**, [74-3] at ¶ 25 & n.6; **CI-4**, *id.* at ¶ 26 & n.7; **CI-5**, *id.* at ¶ 27 & n.9; **CI-6**, *id.* at ¶ 28 & n.10; **CI-7**, *id.* at ¶ 30 & n.12;

Counsel also attacks the accuracy of Agent Anderson's representation in his June affidavit that CI-9 reported that Frontier had threatened Bettor 1 and beaten Bettor 2 over gambling debts. *See* [74-1] at 36. Here, counsel argues that CI-9's claim about Frontier being violent turned out not to be true, and that the person who allegedly got beat up was later interviewed and said Frontier did not beat him up.

But the witness statements attached to Defendant's motion fail to undermine CI-9's information. According to Agent Anderson, CI-9 reported that Frontier "had beaten" Bettor 2 "on Addison Street in Chicago over a gambling debt" and threatened Bettor 1 "over a gambling debt while the individual was at a restaurant in Addison, Illinois." [74-1] at 36. As to Better 2, Defendant claims the information is false because the statements Bettor 2 provided show that Frontier actually was not present for the beating. The record in this case includes several statements from Bettor 2, and in one of those, dating from February 7, 2014, Better 2 did say that he "does not think that Frontier was present when he was beaten." [74-5] at 4. But Bettor 2 nonetheless confirms, in the same statement, that he advised Frontier he did not have the money to pay his gambling debt, that Frontier put him in contact with someone from whom he could borrow money, and that when Bettor 2 showed up to meet that person, he was "blind sided and beaten by more than one male" whose faces he "did not see," and that, while he was being beaten, he was told to pay the money. *Id.* at 4. This is consistent with Bettor 2's December 6, 2013 statement, which indicates that someone told him to contact Frontier to get a line for gambling, and,

---

**CI-8**, *id.* at ¶ 31 & n.13. Defendant makes no challenge as to these other CIs, who all materially support the wire authorization.

when he met Frontier regarding the gambling line, he was beaten. [74-5] at 1. These statements remain consistent with the agent's representations concerning the information he received about Frontier's use of intimidation, threats, and violence to collect gambling debts.

Moreover, even if CI-9's information unfairly suggested that Frontier actually threw the punches when he merely ordered the punches to be thrown, the agent still accurately recounted the information he received from CI-9, and thus, Frontier has otherwise failed to show any falsehood or deception on Agent Anderson's part. Reading Bettor 2's statements in their entirety, this Court finds that Defendant has failed to demonstrate that Agent Anderson made false statements about CI-9's information, much less that the agent made intentionally or recklessly false or misleading statements.

Similarly, Defendant has failed to demonstrate that the representation concerning Bettor 1 was false. In an April 18, 2014 statement, Bettor 1 indicated that he "once had a run in with" Frontier over a gambling debt where Frontier "came up to" him and "tried to collect the money for the person that [Bettor 1] owed." [74-4]. Although Bettor 1 also indicated that Frontier "could not get tough" with him because he "was with his friends," *id.*, the statement remains consistent with the information CI-9 provided: that Frontier threatened Bettor 1.

Counsel also offers a statement from Tony Ricci, a "large sports gambler" who is neither Bettor 1 nor Bettor 2. Ricci, who indicates that Frontier's bookmaking is "directly connected to Gino Cassano," says in a statement that, although he owed

14

Frontier money, Frontier "has not threatened" him. [74-6]. That Frontier may not have threatened Ricci says nothing about whether he threatened Bettor 1, and one instance of restraint does not make other claims of violence or intimidation false. More fundamentally, even if the Court could draw some inference that Ricci's statement somehow undermines CI-9's information about Bettor 1 or Better 2, counsel has offered nothing to suggest that Agent Anderson knew or should have known at the time of the affidavit that any claims of threats, intimidation, or violence were false or unsupported.

In short, Defendant has failed to provide evidence demonstrating that CI-9's statements were false, let alone that Agent Anderson knew they were false or otherwise acted recklessly.

### 3.     Representations Concerning Trash Pulls

Finally, Defendant challenges Agent Anderson's representations concerning the adequacy of trash pulls in meeting the goals of the investigation of Frontier. In his June affidavit, Agent Anderson represented that a wiretap was necessary because normal investigative procedures, including trash pulls, would be inadequate. *See* [74-1] at 60–80 (Section IV). He represents that "trash pulls" would not be effective because, in his view, Frontier would not use his own trash to "dispose of items of any material evidentiary value," and, in any event, "law enforcement has observed security cameras mounted on the exterior of Frontier's residence and facing outward," which would "likely record any trash pulls of Frontier's residence, thus exposing the existence of the investigation to Frontier." *Id.* at 79.

Counsel argues that these representations are false.  In fact, counsel claims, law enforcement had done a trash pull at one point and found a receipt showing a MoneyGram transfer to Costa Rica, as alleged in the indictment.  Therefore, Defendant suggests, Agent Anderson should have known about the prior trash pull and should have known that agents found a MoneyGram receipt when they previously conducted a trash pull at Frontier's house because these agents work for the same organized crime squad.  In this way, Defendant claims that the agent either knew about it or was reckless in making this allegation.  But counsel concedes the existence of the surveillance cameras on Frontier's house, and even if agents successfully pulled his trash once without being observed, nothing would require them to make a second attempt.  Nor does one trash pull recovery make the agent's claims false: the presence of cameras makes discovery by the targets likely, even if agents may have been lucky once before.  Moreover, the agent's statement addresses whether trash pulls can achieve the goals of the investigation in the absence of a wiretap, not whether trash pulls were ever used or produced evidence.  Thus, the statement is not false.

In short, Defendant has offered nothing to suggest that Agent Anderson's statements concerning the effectiveness or risk assessment were false or that he possessed any intent to deceive; his claim thus fails.  *See, e.g., United States v. Glover*, 755 F.3d 811, 820 (7th Cir. 2014) (to meet his burden, defendant "must offer direct evidence" of the agent's state of mind or sufficient "circumstantial evidence" that he

16

possessed "a subjective intent to deceive based on the nature of the omissions) (citing *United States v. McNeese*, 901 F.2d 585, 594 (7th Cir. 1990)).

In attacking Agent Anderson's statements, Defendant may not simply rely upon a bare allegation that an affidavit contains inaccurate information; rather, he must make a substantial proffer that the affiant knew, or recklessly disregarded, that the statement was false and offer "direct evidence of the affiant's state of mind or inferential evidence to prove deliberate falsehood or reckless disregard." *United States v. Whitley*, 249 F.3d 614, 621 (7th Cir. 2001) (citing *United States v. Williams*, 737 F.2d 594 (7th Cir. 1984)) (internal quotation marks omitted). In other words, Defendant's showing must demonstrate that Agent Anderson "perjured himself or acted recklessly because he seriously doubted or had obvious reason to doubt the truth of the allegations." *Johnson*, 580 F.3d at 670. Defendant falls far short of the requisite showing.

## B. Materiality to the Probable Cause Determination

To merit a *Franks* hearing, Defendant must show, not only that the affidavit contains false or misleading statements, but that the alleged falsities or omissions would have affected the court's probable cause finding—that is, if the statements were omitted, probable cause would have been absent. *Schultz*, 586 F.3d at 531; *United States v. Clark*, 935 F.3d 558, 563 (7th Cir. 2019); *McMurtrey*, 704 F.3d at 509. Even if Defendant could demonstrate the former (he has not), he has failed to demonstrate the latter.

17

Initially, where an affidavit "is based primarily on tips from an informant, probable cause can be shown based on the totality of the circumstances," considering, among other factors, the level of detail the informant provided, the extent to which the informant's information is based upon his or her own first-hand observations, the degree to which police have corroborated the informant's information, and the time elapsed between the events reported and the warrant application. *United States v. Clark,* 935 F.3d 558, 564 (7th Cir. 2019) (citing *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *United States v. Glover*, 755 F.3d 811, 816 (7th Cir. 2014)). To the extent Frontier could demonstrate that CI-1's information was false (and he has not), CI-1's information (prior to being deactivated) provided background and historical context and was not material to the decision to grant the June 2016 application that authorized interception of Frontier's phone. To the extent Frontier could demonstrate that CI-9's information was false (and again, he has not do so), the information was fairly detailed, with names and geographic locations, and corroborated (as discussed above) by statements law enforcement obtained from the bettors. As such, CI-9's information, as relayed by the agent, may indeed have contributed to the finding of probable cause. But the information attributed to CI-9 constituted a drop in the bucket: Agent Anderson's affidavit provided substantial other evidence to support probable cause.

Agent Anderson's June affidavit details intercepted communications and other confidential information showing that Gagliano worked with the Chicago Outfit's Norwood Park Street Crew, and that Frontier worked with Gagliano. The affidavit

details recorded conversations between Frontier and Gagliano, a member of the racketeering conspiracy, and between Frontier and other organized crime associates, including Anthony Cassano, Gene Cassano. [74-1] at 37 n.9 and ¶¶ 11, 16. For example, Agent Anderson describes allegations about a May 26, 2016 conversation between Gagliano and Frontier where they used vague language to arrange a meeting (which, per the agent's experience, remained consistent with the common practice of the racketeer associates), and then notes that they, in fact, met the next day, though law enforcement officers were not able to overhear their later conversation. *Id.* ¶ 20(e)–(f). He also says Gagliano and Frontier had another conversation on June 6, 2016 where they again used the same type of vague language to arrange a meeting, *id.* ¶ 20(i), and another conversation on June 10, 2016, where Frontier told Gagliano he had something to give him; they arranged to meet and then surveillance showed that they did meet, with Frontier exiting his vehicle carrying a small black bag, and then Gagliano leaving the meeting carrying the same small black bag, *id.* ¶¶ 20(j), (k), (m). Based upon his training and his significant experience in organized crime investigations, Agent Anderson represented that Outfit members and associates will often deal in cash proceeds and meet in person at random public locations on short notice to transfer cash proceeds, and that the June 2016 encounter between Gagliano and Frontier constitutes one example of this type of conduct. *Id.* ¶ 20(a), (m).

The affidavit also shows that Frontier was a "close associate" of Gene Cassano and worked on behalf of Cassano's bookmaking operation, *id.* ¶ 16. And it details the numerous calls made by and between Target Phone 10 (used by Frontier) and

telephone numbers associated with Cassano, Anthony Dote, and Tony Cassano, all reliably believed, based upon surveillance and investigation, to be involved in illegal gambling operations for the Outfit's Elmwood Park Street Crew. *See* [74-1] ¶ 21 and 51 n.21. Based upon all of Frontier's communications and contacts, including his frequent communications with Gagliano, Agent Anderson represented that he believed Frontier uses wire communications over Target Phone 10 "to discuss and facilitate the business" of the Elmwood Park Street Crew, which "includes the collection, transfer, and distribution of illegally obtained proceedings, including proceeds generated from illegal gambling activities." *Id.* ¶ 22.

In further support of his claims that Gagliano, Cassano, and the others were participants in the racketeering enterprise, Agent Anderson also cites his 111-page May 2016 affidavit. Although much of that affidavit emphasizes Nesbitt's prostitution business and Gagliano's extortion thereof, it does provide context and background for these players within the enterprise. Agent Anderson represents that, based upon information provided by confidential informants, an analysis of pen register data and telephone toll records, and a review of arrest records, Gary Gagliano is associated with the Chicago Outfit's Elmwood Park Street Crew, [74-3] ¶ 11; he represents that source information gathered by the FBI in the 1990s showed that Gagliano was giving out juice money for known members of the crew and making juice loans, and that he was a "top lieutenant" in the crew who oversaw a burglary group for the crew. [74-3] ¶¶ 25–28. Source information also showed that Anthony Dote, who pled guilty in 1995 and again in 2001 to racketeering conspiracy and

operating an illegal gambling business, was also a racketeering participant, serving as a bookmaker and running Outfit crew activities for Marco Damico, *id.* ¶¶ 29, 31, 61(f). The affidavit also represents that, based upon Frontier's participation in efforts to collect gambling debts through violence and threats of violence (as related, in part, by CI-9), as well as his regular contact with Gagliano, there is reason to believe Frontier is associated with organized crime and, more specifically, the Outfit's Elmwood Park Street Crew. *Id.* ¶ 32. Surveillance observed Dote and Frontier, who both had frequent contact with Gagliano over Target Phone 5, meeting on several occasions, *id.* ¶ 34; they also met individually with Gagliano, *id.* 36. Based upon his training and experience, Agent Anderson believed such behavior to be consistent with racketeering activity, including the operation of illegal gambling activities. Read in the context of the organized crime background, the veracity of which Defendant does not dispute beyond the challenges noted above, all of this evidence supports probable cause. *See United States v. Spann*, 2021 WL 916083, at *5 (N.D. Ill. 2021) ("Probable cause exists when the totality of the circumstances reveals a reasonable probability of criminal activity.").

In light of this record, the Court finds that, even if Defendant could show the challenged statements were false (and he cannot), he has not shown that they were material to the probable cause analysis. Based upon information obtained from other investigations, surveillance, and CIs whose statements Defendant does not challenge, Judge Castillo would have granted the application even in the absence of the information from CI-9 and even in the absence of the statements in the prior

affidavits ostensibly tying Frontier to the prostitution-related activities. *See Gatzimos v. Garrett*, 431 F. App'x 497, 501 (7th Cir. 2011) ("We assess materiality by eliminating false statements from the hearing testimony, incorporating any omitted facts, and evaluating whether the resulting testimony still establishes probable cause.") (citing *United States v. McDuffy*, 636 F.3d 361, 363 (7th Cir.2011); *Whitlock v. Brown*, 596 F.3d 406, 411 (7th Cir.2010); *United States v. Pace*, 898 F.2d 1218, 1232–33 (7th Cir.1990)). Probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Gates*, 462 U.S. at 245. This affidavit meets the bar even without CI-9's information and even without any probable cause concerning prostitution-related activities and demonstrates probable cause to believe that Frontier was committing specific offenses, as well as probable cause to believe that a wiretap on Target Phone 10 (undisputedly used by Frontier) would yield particular communications concerning such offenses.

Likewise, as to the trash pulls, even if Defendant could establish that Agent Anderson's statements about trash pulls were false or misleading (he has not), the affidavit does not rely solely upon the trash pull argument. Instead, it discusses why numerous other investigative techniques were also inadequate, and Defendant does not challenge any of those statements, or otherwise explain how additional trash pulls would have met the goals of the investigation. The Court thus has no reason to think that the representations concerning trash pulls (among all other investigative techniques) were material to the probable cause determination or the necessity of the wire intercept. *See, e.g., United States v. Santiago*, 905 F.3d 1013, 1025 (7th Cir.

2018) ("if probable cause to issue the warrant would still exist even if the false statement or material omission were corrected, then no *Franks* hearing is required") (citing *United States v. Carmel*, 548 F.3d 571, 577 (7th Cir. 2008)).

Nor has Defendant demonstrated that the outcome would have been different if Agent Anderson had disclosed that the FBI had previously conducted a trash pull on Frontier's house. On the contrary, such information would have furthered Agent Anderson's representations that normal investigative procedures had either been tried and failed or likely would not succeed. Any omitted statements concerning the trash pull are thus not material. *See United States v. McLee*, 436 F.3d 751, 762–63 (7th Cir. 2006) (§ 2518(1)(c) "was *not* intended to ensure that wiretaps are used only as a last resort in an investigation, but rather that they are 'not to be routinely employed as the initial step' in a criminal investigation.") (quoting *United States v. Thompson*, 944 F.2d 1331, 1340 (7th Cir.1991) (emphasis in original).

## IV.  <u>Conclusion</u>

Based upon the record, Defendant has failed to meet the substantial burden necessary to warrant a *Franks* hearing, and the Court thus denies his motion [72].

Dated: March 22, 2023

Entered:

_John Robert Blakey_
United States District Judge

23